SLR:LDM
2019V02580

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA,

          Plaintiff,

          -against-

SIX HUNDRED THIRTY NINE
THOUSAND FIVE HUNDRED EIGHTY
THREE DOLLARS AND SEVEN CENTS,
MORE OR LESS, FORMERLY ON
DEPOSIT IN BANK OF AMERICA
ACCOUNT NUMBER XXXXXXXX1655,
WITH A BENEFICIARY IDENTIFIED AS
THE HAVENELL TRUST, AND ALL
FUNDS TRACEABLE THERETO,

          Defendant *in rem*.

- - - - - - - - - - - - - - - - - - - - - X

**CV 19 - 5652**

**VERIFIED COMPLAINT
IN REM**

Civil Action No.

**DONNELLY, J.**

**MANN. M.J.**

Plaintiff United States of America, by and through its undersigned counsel, for its

complaint (the "Complaint") alleges, on information and belief, as follows:

## NATURE OF THE ACTION

1.       This is a civil action *in rem* to forfeit approximately $639,583.07

formerly on deposit in Bank of America Account Number XXXXXXXX1655 (the "Havenell

Account") with a beneficiary identified as the Havenell Trust, and all funds traceable thereto

(the "Defendant Funds").

2.       As set forth herein, the Defendant Funds, which were previously seized

by the United States pursuant to a warrant issued in this district, are subject to forfeiture

pursuant to: (a) 18 U.S.C. § 981(a)(1)(C), as property constituting or derived from proceeds

traceable to bribery of a foreign official, or conspiracy to commit such offense; and (b) 18

U.S.C. § 981(a)(1)(A), as property involved in one or more transactions or attempted

transactions in violation of 18 U.S.C. §§ 1956, and/or 1957.

## JURISDICTION AND VENUE

3.　　　　This Court has jurisdiction over this action pursuant to 28 U.S.C.

§§ 1345 and 1355.

4.　　　　Venue is proper, pursuant to 28 U.S.C. §§ 1355 and 1395.

## STATUTORY BACKGROUND

### A.　　Statutes Relating to the Underlying Offenses

5.　　　　The Foreign Corrupt Practices Act, 15 U.S.C. §§ 78dd-1, *et. seq.*

("FCPA") was enacted by Congress for the purpose of, among other things, making it

unlawful to act corruptly in furtherance of an offer, promise, authorization or payment of

money or anything of value, directly or indirectly, to a foreign official for the purpose of

assisting in obtaining or retaining business for, or directing business to, any person or entity.

6.　　　　Pursuant to Section 78dd-3 of the FCPA, it is unlawful for any person,

while in the territory of the United States, corruptly to make use of the mails and means and

instrumentalities of interstate commerce or to do any other act in furtherance of an offer,

payment, promise to pay, or authorization of the payment of any money, offer, gift, promise

to give, or authorization of the giving of anything of value to a foreign official, foreign

political party, or any person, while knowing that all or a portion of such money or thing of

value would be offered, given, or promised to a foreign official, for purposes of (i)

influencing acts and decisions of such foreign official in his or her official capacity; (ii)

inducing such foreign official to do or omit to do acts in violation of the lawful duty of such

2

official; (iii) securing any improper advantage; or (iv) inducing such foreign official to use his or her influence with a foreign government or agencies or instrumentalities thereof to affect or influence acts or decisions of such government or agencies or instrumentalities, in order to assist that person in obtaining or retaining business for or with, or directing business to, any person.

7.      Bribery of a public official is criminalized under Peruvian law, as enumerated by multiple articles of the Criminal Code of the Republic of Peru (the "Peruvian Criminal Code"), including but not limited to that described below. A translated version of the articles described below, in force at the time that the alleged acts herein were committed, is set forth in Attachment A.

8.      Pursuant to Article 384 of the Peruvian Criminal Code, it is a criminal offense for a public official or public servant who, in contracts, supplies, tenders, competitive biddings, auctions, or any other similar operation in which they participate by reason of their office or on a special commission, swindles the Peruvian state or state-sponsored bodies or entities, pursuant to law, by making arrangements with the concerned parties in agreements, adjustments, liquidations, or supplies.

9.      Pursuant to Article 400 of the Peruvian Criminal Code, it is a criminal offense for anyone, including a government official or civil servant, who, invoking or having real or simulated influences, receives, makes someone give, or promise for himself or for others, donations, promises, or any other advantage or benefit, offering to mediate before a government official or civil servant who hears, is hearing, or has heard a judicial or administrative case.

3

10.        Pursuant to 18 U.S.C. § 1956(a)(1)(B)(i), it is unlawful to conduct or attempt to conduct a financial transaction designed in whole or in part to conceal or disguise the source, ownership, or control of the proceeds of specified unlawful activity. Pursuant to 18 U.S.C. § 1956(c)(7)(B)(iv) and 1956(c)(7)(D), the term "specified unlawful activity" includes foreign offenses involving bribery of a public official and violations of the FCPA.

11.        Pursuant to 18 U.S.C. § 1956(a)(2)(B)(i), it is unlawful to transport, transmit, or transfer, or attempt to transport, transmit, or transfer a "monetary instrument or funds" to a place in the United States from or through a place outside the United States to conceal or disguise the source, ownership, or control of the proceeds of specified unlawful activity, *i.e.* foreign offenses involving bribery of a public official and violations of the FCPA.

12.        Pursuant to 18 U.S.C. § 1956(h), it is unlawful to conspire to commit any offense in violation of 18 U.S.C. § 1956 or 18 U.S.C. § 1957.

13.        Pursuant to 18 U.S.C. § 1957(a), it is unlawful to knowingly engage or attempt to engage in a monetary transaction of a value greater than $10,000 in property derived from specified unlawful activity, *i.e.* foreign offenses involving bribery of a public official and violations of the FCPA.

**B.    Forfeiture Statutes**

14.        Pursuant to 18 U.S.C. § 981(a)(1)(A), any property, real or personal, involved in a money laundering transaction or attempted money laundering transaction in violation of 18 U.S.C. § 1956 or 18 U.S.C. § 1957, or any property traceable to such property, is subject to civil forfeiture.

4

15. Pursuant to 18 U.S.C. § 981(a)(1)(C), any property, real or personal, constituting or derived from proceeds traceable to an offense constituting a "specified unlawful activity," *i.e.* foreign offenses involving bribery of a public official and violations of the FCPA, or conspiracy to commit such offenses, is subject to civil forfeiture.

## FACTUAL BACKGROUND

### A. Relevant Entities and Individuals

16. The following entities and individuals are particularly relevant to the Complaint.

a. ***Company 1.*** Company 1 is a Brazilian holding company that, through its subsidiaries and companies in which it was a majority shareholder, conducted business in multiple industries, including engineering, construction, infrastructure, energy, chemicals, utilities and real estate. At all times relevant to this Complaint, Company 1 operated in multiple countries, including Peru.

b. ***Offshore Bank 1.*** Offshore Bank 1 operated in St. Vincent and the Grenadines, and had accounts used by Company 1's agents to make payments in furtherance of Company 1's bribery scheme.

c. ***Offshore Entity 1.*** Offshore Entity 1 is a British Virgin Islands-registered company that was owned by Co-Conspirator 3 (defined below) at all times relevant to the Complaint.

d. ***Offshore Entity 2.*** Offshore Entity 2 is a British Virgin Islands-registered company that was owned by Co-Conspirator 3 at all times relevant to the Complaint.

5

e.    ***Offshore Entity 3***.  Offshore Entity 3 is a Scottish-registered company that was used by Co-Conspirator 3 to conduct transactions at all times relevant to the Complaint.

f.    ***Offshore Entity 4***.  Offshore Entity 4 is a Panama-registered shell company that was owned by Co-Conspirator 3 at all times relevant to the Complaint.

g.    ***Offshore Entity 5***.  Offshore Entity 5 is a Costa Rican-registered shell company that was controlled by Co-Conspirator 2 (defined below) at all times relevant to the Complaint.

h.    ***Offshore Entity 6***.  Offshore Entity 6 is a Costa Rican-registered shell company that was controlled by Co-Conspirator 2 at all times relevant to the Complaint.

i.    ***Offshore Entity 7***.  Offshore Entity 7 is a Costa Rican-registered shell company that was controlled by Co-Conspirator 2 at all times relevant to the Complaint.

j.    ***Offshore Entity 8***.  Offshore Entity 8 is a British Virgin Islands-registered shell company that was owned by Alejandro Celestino Toledo Manrique at all times relevant to the Complaint.

k.    ***Offshore Entity 9***.  Offshore Entity 9 is a Panama-registered shell company that was owned and/or controlled by Co-Conspirator 3 at all times relevant to the Complaint.

l.    ***Alejandro Celestino Toledo Manrique***.  Toledo held the public office of the elected President of Peru from 2001 to 2006, and during this time was a "public official" as that term is used in 18 U.S.C. § 1956(c)(7)(B)(iv) and was a "public official"

within the meaning of Peruvian law. In or about 2004, Toledo caused his representatives, including Co-Conspirator 2 (described below) to solicit payments from Company 1 while he was a public official, and received such payments, including the funds described herein, after his term of office ended.

m. **_Toledo Relative 1_**. Toledo Relative 1 is and was a relative of Toledo's at all times relevant to the Complaint.

n. **_Co-Conspirator 1_**. Co-Conspirator 1 is a Brazilian national who oversaw Company 1's operations in Peru from approximately 2001 through 2012. In this role, Co-Conspirator 1 had direct contact with Toledo at all times relevant to the Complaint.

o. **_Co-Conspirator 2_**. Co-Conspirator 2 is believed to be a Peruvian national who served as Toledo's head of security during Toledo's administration.

p. **_Co-Conspirator 3_**. Co-Conspirator 3 is an Israeli national and businessman who was a close friend and associate of Toledo's at all times relevant to the Complaint. In approximately August 2017, Co-Conspirator 3 entered into a cooperation agreement with Peruvian authorities in their ongoing investigation.

q. **_Co-Conspirator 4_**. Co-Conspirator 4 is believed to be an Israeli national who was employed by Co-Conspirator 3 at all times relevant to the Complaint.

r. **_Co-Conspirator 5_**. Co-Conspirator 5 is believed to be an Israeli national who was employed by Co-Conspirator 3 at all times relevant to the Complaint.

s. **_Witness 1_**. Witness 1 is a U.S. national who was a family friend of Toledo's and a licensed real estate agent at all times relevant to the Complaint.

t. **_Witness 2_**. Witness 2 is a U.S. national and a licensed attorney at all times relevant to the Complaint.

7

**B.     Overview of Company 1's Bribery Scheme**

17.         Between approximately 2001 and 2016, Company 1, together with certain Company 1 employees and agents and other co-conspirators, engaged in a massive bribery scheme in which they agreed with others to corruptly provide over $700 million in payments and other things of value to, and for the benefit of, foreign officials. The purpose of the scheme was to secure an improper advantage and to influence those foreign officials, foreign political parties and foreign political candidates in order to obtain and retain business in twelve countries, including Peru, and involved the use of financial institutions in the United States and the acquisition of assets in the United States by those officials.

18.         Many of these corrupt payments were disbursed by Company 1 through the United States to a series of offshore entities that were established and managed by beneficial owners who were compensated for opening and, in some cases, operating these entities. Many of the transactions were layered through multiple levels of offshore entities and bank accounts throughout the world, before reaching the final recipient. In this regard, members of the conspiracy sought to distance the origin of the funds from the final beneficiaries.

19.         Company 1 maintained records of incoming bribe requests and outgoing payments on an encrypted server, which kept information such as the delivery address for cash payments or account information for wire payments. Although the illicit payments were not included on Company 1's balance sheet, the payments were debited from individual country budgets as "project expenses." These project names, as well as the amount(s) requested, and the recipient codename(s), were provided by Company 1's country

managers. As a result, Company 1 maintained records of most, if not all, of the illicit payments it made as part of the bribery scheme.

20.          The funds were disbursed from the offshore entities controlled by Company 1 at Company 1's direction. These disbursements were made by financial operators who acted on Company 1's behalf, including but not limited to the beneficial owners of the accounts and intermediaries who delivered the payments in cash, or made the payments via wire transfer through one or more of the offshore entities. Most, if not all, of these offshore shell companies did not provide any real services, although they frequently appeared in contracts and on invoices, including as subcontractors, in order to disguise the movement of illicit funds. Several of the funds transfers in this scheme were wired through financial institutions, using wires which were transmitted through the jurisdiction of the Eastern District of New York.

### C.    Toledo Received Approximately $25 Million in Bribery Payments In Exchange for Official Acts

21.          Beginning in approximately 2004, Toledo and agents acting on his behalf began soliciting bribery funds from Company 1 in exchange for using Toledo's influence in favor of Company 1 in its bid for construction contracts in connection with the Peru-Brazil Southern Interoceanic Highway (the "Southern Interoceanic Highway"), a Peruvian government infrastructure project.

22.          In 2004 or 2005, Co-Conspirator 2 approached Co-Conspirator 1 at an event in Lima, Peru, and introduced himself as an intermediary for Toledo. During this event, Co-Conspirator 2 told Co-Conspirator 1 that Toledo would favor Company 1 in its bid for the Southern Interoceanic Highway by maintaining the bidding timeframes and

modifying the bidding terms to make it difficult or impossible for other companies to compete for these contracts.

23.　　　　In or around the same time, Toledo told Co-Conspirator 3 that he intended to establish a "foundation," and asked Co-Conspirator 3 if he would help receive the "donations" that were expected to arrive for this foundation. Co-Conspirator 3 agreed to receive the "donations" through entities and accounts under his control.

24.　　　　Co-Conspirator 2 subsequently invited Co-Conspirator 1 to a meeting at the Government Palace in Lima. During this meeting, Co-Conspirator 2 told Co-Conspirator 1 that if Company 1 won the tenders for the Southern Interoceanic Highway, Company 1 would be expected to make payments to Toledo, in amounts to be later specified, through Co-Conspirator 3's network of companies.

25.　　　　Co-Conspirator 1 subsequently met with Toledo, Co-Conspirator 3, Co-Conspirator 4 and Co-Conspirator 5 in a hotel in Rio de Janeiro, Brazil. During this meeting, Co-Conspirator 4 and Co-Conspirator 5 informed Co-Conspirator 1 that if Company 1 won the tenders for the Southern Interoceanic Highway, Company 1 was expected to pay $35 million to Toledo through Co-Conspirator 3's accounts.

26.　　　　Between approximately 2006 and 2010, after the contract for construction of sections 2 and 3 of the Southern Interoceanic Highway was awarded to a consortium of partners including Company 1, Co-Conspirator 1 instructed Company 1 individuals responsible for making bribery payments to pay approximately $25 million to Toledo through Co-Conspirator 3's accounts. Co-Conspirator 1 did not request payment of the full $35 million because Toledo had not modified the bidding terms to limit or eliminate

competition from other bidders for the Southern Interoceanic Highway; nevertheless, Toledo did maintain the bidding timeframes while he was still in office, to Company 1's advantage.

27.     At Co-Conspirator 1's direction, Company 1 made payments totaling approximately $25 million into Co-Conspirator 3's accounts for the benefit of Toledo, including the following:

> a. On or about June 23, 2006, $750,000 was sent via wire transfer from Company 1's account at Offshore Bank 1 to Offshore Entity 1.
>
> b. Between approximately August 2006 and January 2010, accounts used by Company 1 to make bribery payments, including accounts held by Offshore Bank 1, sent at least $18 million via wire transfer to Offshore Entity 3, through a U.S. correspondent bank account at Barclays Bank in New York.
>
> c. Between approximately January 2010 and July 2010, accounts used by Company 1 to make bribery payments sent payments via wire transfer totaling approximately $5 million to Offshore Entity 2. At least one of these payments was caused by an agent of Company 1 while located in the United States.

28.     Co-Conspirator 3 directed some or all of the funds he received through Offshore Entity 1, Offshore Entity 2, and Offshore Entity 3 to another account under his control, held in the name of Offshore Entity 4, a Panama entity. In an agreement purportedly entered into by Offshore Entity 3 and Offshore Entity 4, dated May 8, 2006, titled "Mandate to Enforce Payment," Offshore Entity 4 affirmed that it "has rendered – directly and indirectly – certain services to [Company 1], and that the purpose of this agreement is the

11

"enforcement, collection, receipt, and the arrangement of onward payments [by Offshore Entity 3] to [Offshore Entity 4]." In reality, Offshore Entity 4 never rendered any legitimate services to Company 1, and Offshore Entity 3 was merely used as a conduit entity to distance Co-Conspirator 3 from the Company 1 payments.

29.　　　At Co-Conspirator 2's direction, Co-Conspirator 3 subsequently transferred at least $9 million of the Company 1 payments received by the Offshore Entity 3 and Offshore Entity 4 accounts into Costa Rican bank accounts held by Offshore Entity 5, Offshore Entity 6, and Offshore Entity 7. Each of these entities (Offshore Entity 5, Offshore Entity 6, and Offshore Entity 7) was owned or controlled by Co-Conspirator 2 for the benefit of Toledo.

30.　　　As detailed below, Co-Conspirator 3 also caused approximately $1.2 million of the Company 1 payments received through Offshore Entity 3 and Offshore Entity 4 to be used towards the purchase of real estate in Maryland for the benefit of Toledo.

### D.　Toledo and Co-Conspirator 3 Used Approximately $1.2 Million of the Bribery Payments To Purchase Real Estate in Maryland

31.　　　In or around 2007, approximately $1.2 million of the bribery payments that Company 1 paid to Toledo, and laundered through accounts used or controlled by Co-Conspirator 3, were used to purchase real property in Bethesda, Maryland, for the benefit of Toledo and his family as described below.

32.　　　In or around August 2006, after his term of public office had ended, Toledo met with Witness 1 in Washington D.C. to discuss purchasing a home in the Washington, D.C. area, although Toledo told Witness 1 that he would likely not move to the

12

area for at least another two years. Witness 1 showed Toledo Relative 1 several residences in the D.C. area, all valued at under $1 million.

33.          In or around the first half of 2007, Toledo and Toledo Relative 1 asked Witness 1 to show them real properties in the D.C. area valued in excess of $1 million. Toledo told Witness 1 that he now intended to finance this anticipated purchase with funds from Co-Conspirator 3, whom he named, and could therefore afford a home with a higher purchase price. Toledo also told Witness 1 that he was concerned about his name appearing on any official documents relating to the purchase or management of any real property in the United States.

34.          In or around August 2007, Witness 1 submitted an offer on behalf of Toledo and Toledo Relative 1 for the real property located at 8933 Holly Leaf Lane in Bethesda, Maryland (the "Maryland Property").

35.          In a letter dated August 27, 2007 from Witness 1 to Toledo and Toledo Relative 1, Witness 1 attached a sales contract for the Maryland Property. In discussing closing costs for the Maryland Property, Witness 1 wrote, "Hopefully, your source for the money has no associated fees."

36.          In a letter written by Co-Conspirator 3 to Witness 1, dated August 29, 2007, Co-Conspirator 3 stated, "We have procured the necessary funding for the purchase and settlement of the 8933 Holly Leaf Lane, Bethesda, MD property in the amount of $1,225,000.00 and will be able to transfer these funds to our new Maryland business entity shortly when it is formed and an associated bank account is established for it." Co-Conspirator 3 further stated in the letter that he "would only be able to sign a contract to

13

purchase the desired property as a soon to be authorized representative of the Maryland business entity soon to be formed."

37.         The next day, August 30, 2007, 8933 Holly Leaf Lane, Inc. (the "Maryland Corporation") was incorporated in Maryland by Witness 2, a Maryland-based attorney, and registered to the address of Witness 1. Co-Conspirator 4 wired the funds for the incorporation of the Maryland Corporation to Witness 2.

38.         On or about September 10, 2007, Co-Conspirator 4, on behalf of the Maryland Corporation, executed a Residential Contract of Sale for the Maryland Property for the sum of $1.2 million. As set forth below, the funds used to purchase the Maryland Property are involved in and/or traceable to the bribery payments that Company 1 paid to Toledo through Co-Conspirator 3's accounts:

     a. Between approximately August 16, 2006 and August 3, 2007, Offshore Bank 1 transferred, through several wires, approximately $4.7 million in funds involved in and/or traceable to Company 1's bribery scheme, as described above in Paragraph 27(b), to Offshore Entity 3's account at Barclays Bank UK. Each of these transfers passed through a U.S. correspondent bank account in Barclays Bank in New York.

     b. On or about August 7, 2007, Offshore Entity 3's account at Barclays Bank UK transferred approximately $1.3 million in funds involved in and/or traceable to Company 1's bribery scheme, to Offshore Entity 4's account at LGT Bank in Switzerland.

     c. On or about September 19, 2007, Co-Conspirator 3 sent via wire transfer approximately $1.2 million in funds through another Swiss account he

14

controlled, held in the name of Offshore Entity 9 at Banque Privee Edmond de

Rothschild S.A. in Switzerland, to Witness 2's law firm to pay for the

Property. Public records show that Offshore Entity 9 was incorporated in

Panama on or about July 23, 2007, and was dissolved on or about October 15,

2007; accordingly, Offshore Entity 9 was likely incorporated for the sole

purpose of conducting this property transaction.

39.     In a real estate deed dated September 26, 2007, title passed from the

sellers of the Maryland Property to the Maryland Corporation.

### E.     Toledo Created a False Rental Agreement to Hide His Ownership of the Maryland Property

40.     Toledo took further steps to hide his ownership of the Maryland

Property and the source of funds used to purchase the Maryland Property by creating a false

rental agreement with the Maryland Corporation to rent the Maryland Property.

41.     After the Maryland Corporation purchased the Maryland Property in or

around September 2007, the Maryland Property remained unoccupied until approximately

September 2009, when Toledo and Toledo Relative 1 moved in. Prior to moving in,

however, Toledo and Toledo Relative 1 requested several renovations to the Maryland

Property. To pay for the renovations, Co-Conspirator 4, on behalf of Co-Conspirator 3,

wired funds totaling approximately $100,000 from account(s) under Co-Conspirator 3's

control to the Maryland Property's management account.

42.     On or about August 20, 2009, the Maryland Corporation and Toledo

executed a lease agreement for Toledo and Toledo Relative 1 to lease the Maryland Property

from September 1, 2009 through August 31, 2012. The lease agreement did not require a

security deposit or pro rata rental payments to cover the period between August 21, 2009 and August 31, 2009, and specified that the Maryland Corporation would be paying the utility bills. Toledo and Toledo Relative 1 made it clear to Witness 1 that they did not want their names appearing on any utility bills.

43.        In or around September 2009, Toledo gave Witness 1 twelve checks, all at once, sequentially dated for the first of the month from September 1, 2009 to August 1, 2010, of $4,000 each (totaling $48,000) drawn on an account held by Toledo at Stanford Federal Credit Union (the "5539 Account") and another account he held at Bank of America (the "2138 Account"). Toledo instructed Witness 1 to send these checks, which were all made payable to the Maryland Corporation, to Co-Conspirator 3. Approximately three months later, Witness 1 sent an e-mail to Co-Conspirator 4 asking where the checks should be sent, and Co-Conspirator 4 instructed Witness 1 to send them to an address maintained by Co-Conspirator 3 in Aventura, Florida.

44.        However, in another e-mail from Witness 1 to Co-Conspirator 4, dated October 1, 2009, Witness 1 speculated as to potential tax consequences for the Maryland Corporation for the Maryland Property's rental payments, and wrote, "[I]f I am correct that if the situation is such that the [Maryland Corporation] is not really enjoying a rental income from the tenant but is actually giving the rental payment back to the tenant then it is probably not a taxable situation."

45.        In another e-mail from Witness 1 to Co-Conspirator 4, dated March 11, 2010, Witness 1 listed a sum of approximately $20,000 from Toledo that Witness 1 had deposited into the Maryland Property's management account at M&T Bank from approximately July 2008 to August 2008, prior to the beginning of Toledo's rental

16

agreement, and stated that the "tenant wants to know how you will be refunding these payments to him." Witness 1 further explained that he had difficulty discussing "these matters with the tenant [because] I do not know what relationship and/or agreement you or [Co-Conspirator 3] may have or not have previously agreed to between yourselves in the handling of this property."

46.     On or about May 23, 2010, nearly nine months after the purported rental agreement began, the Maryland Corporation opened a bank account at Bank Hapoalim in New York (the "BH Account") for the purported receipt of rental payments. The account opening documents list Co-Conspirator 3 as the president and treasurer of the Maryland Corporation, as well as the beneficial owner of the account. The other officers listed are Co-Conspirator 4 and Co-Conspirator 5.

47.     On or about November 17, 2010, four sequentially numbered checks for $4,000 (totaling $16,000), each drawn from Toledo's 2138 Account, were deposited into the BH Account. The "memo" lines on these checks read: "Rent May 2010," "Rent June 2010," "Rent July 2010," and "Rent August 2010."

48.     On or about February 4, 2011, four additional checks totaling $80,000, each dated January 15, 2011, were deposited into the BH Account. Three of these checks were sequentially numbered and drawn from the 2138 Account; the fourth check was drawn from another Bank of America account also held in the name of Toledo (the "5898 Account"). The "memo" line on these checks read: "2010-2011," "2010-XXX," "2009," and "2009-2010," respectively.

49.     On or about August 16, 2011, Offshore Entity 2 refunded the approximate total amount of the eight "rent" checks from Toledo described in Paragraphs 47

17

and 48 above by sending a wire transfer in the amount of $95,000 from its account at

Citibank London back to Toledo's 5898 Account. Bank records confirm that the eight "rent"

checks were the only deposits into the BH Account from when it was first opened, on or

about May 23, 2010, to when it was formally closed, on or about May 31, 2013.

**F. Toledo Laundered the Proceeds from the Sale of the Maryland Property and Other Bribery Payments Through the Havenell Account**

50.        In addition to directing Co-Conspirator 3 to purchase the Maryland

Property through a corporation to be formed for that purpose and creating a false rental

agreement, as alleged herein, Toledo established the Havenell Account to launder both the

proceeds from the sale of the Maryland Property as well as other funds traceable to the

Company 1 bribery scheme laundered through Offshore Entity 8.

      i.  Sale of the Maryland Property and Deposit of the Sale Proceeds into the Havenell Account.

51.        In a Stock Purchase Agreement dated July 26, 2011, Co-Conspirator 3

agreed to sell all of the shares of the Maryland Corporation to Toledo and Toledo Relative 1

for a purchase price of $1.2 million. However, neither Toledo nor Toledo Relative 1 ever

paid any sum to Co-Conspirator 3 as consideration for the shares. As set forth above, nor

does it appear that Toledo and Toledo Relative 1 ever made any legitimate rental payments

to the Maryland Corporation in connection with the purported lease agreement, as at least

$95,000 of these payments were returned to them by Co-Conspirator 3, and e-mails from

Witness 1 indicate that the other payments may also have been "refunded" to them.

52.        In a real estate deed dated October 3, 2012, the Maryland Corporation

transferred title of the Maryland Property to an entity known as the Havenell Trust for a sum

of zero dollars. Witness 2's law firm prepared the trust documents for the Havenell Trust. In

an "Irrevocable Trust Agreement" dated October 3, 2012, Toledo and Toledo Relative 1 transferred the Property to the Havenell Trust, to "hold and manage the [Maryland Property] for the benefit of the Beneficiaries, who shall be [Toledo] and [Toledo Relative 1] . . . ." Toledo and Toledo Relative 1 signed this agreement as both the "Trustors" and the "Trustees" of the Havenell Trust. The Irrevocable Trust Agreement was amended on or about October 12, 2013, to replace Toledo and Toledo Relative 1 with Witness 1 as the Trustee; this agreement was amended again on or about October 18, 2014, to replace Witness 1 with Witness 2 as the Trustee.

53.     On or around April 15, 2015, the Havenell Trust sold the Maryland Property to a third party for approximately $1.2 million (the "Sale Proceeds"), the same price originally paid by the Maryland Corporation for the Maryland Property in 2007.

54.     On or about May 11, 2015, less than one month after the 2015 Sale, the Havenell Trust opened the Havenell Account at a Bank of America branch in Colesville, Maryland, and deposited $1.1 million of the Sale Proceeds into this account.

ii.  Deposit of Additional Bribery Funds From Offshore Entity 8 Into the Havenell Account

55.     In or around July 2016, Toledo told Witness 1 that he wanted to transfer funds from an account that he held in the name of Offshore Entity 8 (the "Offshore Entity 8 Account") at Towerbank International in Panama to the Havenell Account, and asked Witness 1 to coordinate the transfer. On or about July 20, 2016, the Offshore Entity 8 Account transferred approximately $700,000 into the Havenell Account.

56.     Records show that from approximately November 2011 through March 2012, Offshore Entity 8 had received wire transfers from an account used by Offshore Entity

19

6 to receive bribes traceable to Company 1 payments totaling approximately $670,000. A "Consulting Contract" dated September 22, 2011 between Offshore Entity 6 and Offshore Entity 8 purports to justify these transfers as consulting payments, and was signed by Toledo on behalf of Offshore Entity 8.

57.     As stated above in Paragraph 29, Offshore Entity 6 was one of the Costa Rican shell entities used by Toledo to launder the Company 1 payments. Indeed, from approximately February 2007 through May 2010, Offshore Entity 6 received seventeen wire payments totaling nearly $8.5 million traceable to Company 1 payments from Offshore Entity 4.

> iii.     Transfer of Funds from the Havenell Account to Other Accounts Controlled by Toledo

58.     From July 2015 until the Havenell Account was seized by the United States on or about August 18, 2018, at Toledo's direction, the Havenell Account transferred approximately $974,000 to an attorney escrow account held by Witness 2's law firm at Bank of America (the "Attorney Escrow Account"). From July 2015 through March 2018, approximately $550,000 of the Havenell Account funds deposited into the Attorney Escrow Account were further transferred, at Toledo's direction, to other accounts owned by Toledo at Bank of America and Stanford Federal Credit Union. On or about June 15, 2016, $200,000 of the funds deposited into the Attorney Escrow Account from the Havenell Account were further transferred to an account held in the name of another of Toledo's associates.

59.     On or about September 8, 2015 and September 9, 2015, the Havenell Account directly transferred $100,000 to an account held by Toledo at Bank of America.

60.     As of August 23, 2018, all of the funds in the Havenell Account – *i.e.*, the Defendant Funds – are derived from the Sale Proceeds or Offshore Entity 8's account at Towerbank. Each of these sources contains funds that are traceable to and/or involved in the Company 1 bribery scheme. Accordingly, the Defendant Funds are subject to forfeiture.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
(Forfeiture, pursuant to 18 U.S.C. § 981(a)(1)(C))

61.     The United States incorporates by reference the allegations set forth in Paragraphs 1 through 60 above as if fully set forth herein.

62.     The Defendant Funds are property that constitutes or is derived from proceeds traceable to specified unlawful activity, which is defined in 18 U.S.C. § 1956(c)(7)(A), (c)(7)(B)(iv), and (c)(7)(D) to include, among other things, foreign offenses involving bribery of a public official and violations of the FCPA.

63.     The foreign offenses at issue include violations of Peruvian law.

64.     The Defendant Funds are therefore subject to forfeiture, pursuant to 18 U.S.C. § 981(a)(1)(C).

## SECOND CLAIM FOR RELIEF
(Forfeiture, pursuant to 18 U.S.C. § 981(a)(1)(A))

65.     The United States incorporates by reference the allegations set forth in Paragraphs 1 through 60 above as if fully set forth herein.

66.     The Defendant Funds are property that is involved in and/or traceable to transactions or attempted transactions of a value greater than $10,000 in property derived from specified unlawful activity, in violation of 18 U.S.C. § 1957.

67.     The Defendant Funds are therefore subject to forfeiture, pursuant to 18 U.S.C. § 981(a)(1)(A).

## THIRD CLAIM FOR RELIEF
(Forfeiture, pursuant to 18 U.S.C. § 981(a)(1)(A))

68.     The United States incorporates by reference the allegations set forth in Paragraphs 1 through 60 above as if fully set forth herein.

69.     The Defendant Funds are property that is involved in, and/or is traceable to transactions or attempted transactions designed in whole or in part to conceal or disguise the source, ownership, or control of the proceeds of specified unlawful, in violation of 18 U.S.C. § 1956(a)(1)(B)(i).

70.     The Defendant Funds are therefore subject to forfeiture, pursuant to 18 U.S.C. § 981(a)(1)(A).

## FOURTH CLAIM FOR RELIEF
(Forfeiture, pursuant to 18 U.S.C. § 981(a)(1)(A))

71.     The United States incorporates by reference the allegations set forth in Paragraphs 1 to 60 above as if fully set forth herein.

72.     The Defendant Funds are property that is involved in the actual or attempted transportation, transmission, or transfers of a "monetary instrument or funds" to a place in the United States from or through a place outside the United States, knowing that the monetary instrument or funds involved in the transportation, transmission, or transfers is designed in whole or in part to conceal or disguise the source, ownership, or control of the proceeds of specified unlawful activity, in violation of 18 U.S.C. § 1956(a)(2)(B)(i).

73.     The Defendant Funds are therefore subject to forfeiture, pursuant to 18 U.S.C. § 981(a)(1)(A).

FIFTH CLAIM FOR RELIEF
(Forfeiture, pursuant to 18 U.S.C. § 981(a)(1)(A))

74.     The United States incorporates by reference the allegations set forth in Paragraphs 1 to 60 above as if fully set forth herein.

75.     The Defendant Funds are property that is involved in a conspiracy to conduct, or attempt to conduct, transactions in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i), (a)(2)(B)(i), and/or 1957, affecting foreign commerce, in violation of 18 U.S.C. § 1956(h), or is traceable to such property.

76.     The Defendant Funds are therefore subject to forfeiture, pursuant to 18 U.S.C. § 981(a)(1)(A).

**CONCLUSION**

WHEREFORE, plaintiff United States requests that: the Court issue a Warrant for the arrest of the Defendant Funds; the Defendant Funds be forfeited and condemned to the use and benefit of the United States; and plaintiff be awarded its costs and disbursements

in this action and for such other and further relief as this Court deems just and proper.

Dated: Washington, D.C.
October 4, 2019

DEBORAH CONNOR
Chief, Money Laundering and Asset Recovery
Section (MLARS), Criminal Division
U.S. Department of Justice


By: */s/ Barbara Y. Levy*
Barbara Y. Levy
Trial Attorney, MLARS
Phone: (202) 353-9759


RICHARD P. DONOGHUE
United States Attorney
Eastern District of New York


By: */s/ Laura D. Mantell*
Laura D. Mantell
Assistant United States Attorney
Phone: (718) 254-6253

## VERIFICATION

Jeff H. Graham, hereby declares as follows:

1.      I am a Special Agent with the Federal Bureau of Investigation.

2.      I have read the within verified complaint *in rem* and know the contents thereof.

3.      I believe the matters contained in the within verified complaint *in rem* are true and accurate to the best of my knowledge, information and belief.

4.   .   The source of my information and the grounds for my belief are personal knowledge and information provided by other law enforcement officers and the official files and records of the United States of America.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated:   Pretoria, South Africa
         October  4 , 2019

_____
Jeff H. Graham
Federal Bureau of Investigation

# **ATTACHMENT A**

## **Section 384, Peruvian Criminal Code: Collusion**

The public official or public servant who, in contracts, supplies, tenders, competitive biddings, auctions, or any other similar operation in which they participate by reason of their office or on a special commission, swindles the Peruvian state or state-sponsored bodies or entities, pursuant to law, by making arrangements with the concerned parties in agreements, adjustments, liquidations, or supplies, shall be punished by imprisonment of not less than three nor more than fifteen years.

## **Section 400, Peruvian Criminal Code: Influence Peddling**

Whoever, invoking or having real or simulated influences, receives, makes someone give or promise for himself or for others, donations or promises or any other advantage or benefit offering to mediate before a government official or civil servant who hears, is hearing or has heard a judicial or administrative case, shall be punished by imprisonment for not less than four nor more than six years.

If the perpetrator is a public official or public servant, he shall be punished by imprisonment for not less than nor more than eight years and disqualification pursuant to subsections 1 and 2 of Article 36 of the Peruvian Criminal Code.